NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 96

No. 2018-055

| | |
|---|---|
| Caroline S. Lee | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Family Division |
| | |
| Mark Ogilbee | June Term, 2018 |

Elizabeth D. Mann, J.

John B. Loftus, III and C. Justin Sheng of Brannen & Loftus, PLLC, Hanover, New Hampshire, for Plaintiff-Appellee.

Emily S. Davis of Davis Steadman Ford & Mace, LLC, White River Junction, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.   **EATON, J.**   Father appeals the trial court's final divorce order, challenging the court's parent-child contact plan, parental rights and responsibilities determination, and property division. We affirm in part, and reverse and remand in part.

### I. Facts & Procedural History

¶ 2.   Mark Ogilbee (father) and Caroline Lee (mother) were married in January 1995 and separated in December 2015. The parties have one child, a daughter born in 2010. During the marriage, the parties moved several times to accommodate their career aspirations, eventually settling in Vermont in 2006. Father has suffered from the disease of alcoholism for over twenty years, and the couple has grappled with the ramifications of his alcoholism throughout their

marriage.  Mother became aware of father's problems with alcohol in 1997 when father was hospitalized due to alcohol-induced seizures.  Despite father's attempts to achieve sobriety, he has had multiple relapses.  During these relapses, father will binge drink, often secretly, until he is discovered.  On several occasions, his intoxication has impacted their daughter.  The trial court found multiple instances before and after the parties' separation when father was obligated to care for their daughter or attend a scheduled event and was unable to do so due to his intoxication.  The trial court further found that these and other incidents upset their daughter and placed her at risk of harm.  For example, while in her father's care, the daughter injured her forehead due to father's inattentiveness.  He later admitted he was inebriated and did not know how she sustained the injury.  After the parties' separation, father suffered relapses in his sobriety and missed court-scheduled parent-child contact dates with their daughter.  Father has participated in both inpatient and outpatient treatment for his alcoholism.  However, the trial court found father "is an alcoholic who desires sobriety but has not yet attained recovery" and "has no credibility on drinking issues."

¶ 3.     Mother filed a complaint for divorce in March 2016 and requested that the court grant her sole legal and physical parental rights and responsibilities.  Mother also asked the court to award her child support, medical support, and/or supplemental maintenance, and to divide the parties' assets.  Both parties presented proposals for parental rights and responsibilities and parent-child contact.  Father conceded sole physical rights to mother, but he sought liberal parent-child contact.  He proposed several alcohol-related conditions to ensure his sobriety during his time with their daughter, including abstaining from alcohol during her visits, sending mother frequent breathalyzer tests, and attending treatment groups to support his sobriety.  Father also sought legal parental rights and responsibilities in decision-making for their daughter,[1] 50% of the marital estate, and alimony.

_____

[1]  Father was primarily concerned with medical and dental decision-making authority because his daughter remained a beneficiary on his medical and dental insurance.

2

¶ 4.     The court issued its final order and decree of divorce in November 2017 addressing three main issues: parental rights and responsibilities, property division, and spousal maintenance. Regarding parental rights and responsibilities, the court awarded primary physical and legal parental rights and responsibilities to mother. The court explained that mother should "engage in meaningful consultation with [father] regarding significant decisions regarding [their daughter's] education and health concerns[,] but if there is a disagreement between the [p]arties, [mother] shall have the final decision-making authority."

¶ 5.     The court also established the parent-child contact schedule and set alcohol-related conditions for father's visits with his daughter. The contact schedule limited father's time with the child, which the court attributed to its concerns over father's alcohol abuse. Due to father's ongoing relapses, Phase One of the parent-child contact schedule did not allow father to have overnight visits with his daughter for the first ninety days following the divorce order. After the ninety-day period, Phase Two of the contact schedule allowed the daughter to "be with [father] on Friday from after[ ]school until the start of school on Monday" every other weekend. The court set this alternating-weekend schedule to continue "thereafter." The conditions of parent-child contact required that father abstain from using alcohol, submit to alcohol-detection urinalysis upon wife's reasonable suspicion and request, and participate in treatment to ensure continued sobriety, among other conditions. The court also provided that the parent-child contact schedule "may be modified without a court order providing both parents agree to the modification."

¶ 6.     The court divided the parties' property based on what it said was an award of 60% of the assets to mother and 40% of the assets to father. The court made this division based on the parties' earnings and contributions to the marriage. The court found that mother made the greater financial contribution to the marriage and had the greater earnings. The court further found that both parties are well educated and able to acquire income and assets as they move forward and are on relatively equal footing in their ability to realize income. The court awarded the marital

3

residence to mother and split their retirement funds on the same 60/40 basis. The court valued the parties' assets as of from the date of their separation, rather than the date of the final divorce hearing.[2] The court denied father's request for maintenance.

¶ 7.     Father filed a motion to amend judgment with respect to the parent-child contact schedule and the property division. Soon after, the court issued an entry order granting both parties holiday and vacation time with their daughter—holiday parenting time had been inadvertently omitted from the original parenting schedule—and provided that their daughter's summer vacation would be equally shared by the parties. Both parties filed motions to amend that order, and the court issued two orders in response: an entry order responding to the parties' motions to amend and an amended final order and decree of divorce. In the final order, the court altered the parent-child contact schedule for summer vacation so that the alternating-week schedule for summer vacations under the initial order would not start until 2020 to give father time to "fully 'advance his recovery.'" The court also gave further justification for its 60/40 property division, explaining that it valued the equity in the marital property as of the parties' separation date to account for inflation in the value of the residence and to avoid "unjustly benefit[ting]" husband for the mortgage payments made by wife following separation, and assigned husband's credit card debt and personal loans to husband. This appeal followed.

¶ 8.     Father raises several issues on appeal. He alleges that the court abused its discretion in establishing the parent-child contact schedule, awarding sole legal rights and responsibilities to mother, and distributing the marital assets. We consider each claim in turn.

---

[2]  Father asserts that the court's division actually resulted in an award of 71.8% of the marital assets to mother and 29.2% to father. He contests the court's decision valuing the equity in the marital home at the time of separation and the apportionment of husband's debts.

4

## II. Standard of Review

¶ 9.     We review the trial court's determination regarding the parent-child contact plan, parental rights and responsibilities, and property distribution for abuse of discretion. See LeBlanc v. LeBlanc, 2014 VT 65, ¶ 21, 197 Vt. 17, 100 A.3d 345 ("The family court has broad discretion in determining what allocation of parental rights and responsibilities is in a child's best interests."); MacCormack v. MacCormack, 2015 VT 64, ¶ 17, 199 Vt. 233, 123 A.3d 383 ("The trial court enjoys broad discretion in dividing the marital property, and we will uphold its decision unless that discretion was withheld or abused."). "The court's conclusions will stand where supported by the findings." LeBlanc, 2014 VT 65, ¶ 21.

## III. Parent-Child Contact Schedule

¶ 10.    First, we consider whether the court abused its discretion in setting the parent-child contact schedule. We conclude that it did not and affirm this portion of the order.

¶ 11.    While the court may exercise its broad discretion in evaluating the statutory best-interests factors, its approach must be fair and consistent with the plain language of 15 V.S.A. § 665(b). Bratton v. Holland, 2018 VT 54, ¶ 17, __ Vt. __, __ A.3d__. We will uphold the trial court's parent-child contact award if it shows "reasoned judgment in light of the record evidence." DeLeonardis v. Page, 2010 VT 52, ¶ 20, 188 Vt. 94, 998 A.2d 1072 (quotation omitted).[3]

---

[3] Appellant asserts that reviewing the court's order requires this Court to interpret 15 V.S.A. § 650 and asks us to review the trial court's parent-child contact plan de novo as a question of law. We decline to do so. Section 650 states the Vermont Legislature's position that "after parents have separated or dissolved their civil marriage, it is in the best interests of their minor child to have the opportunity for maximum continuing physical and emotional contact with both parents." 15 V.S.A. § 650. However, while § 650 states an important policy goal, the statute does not remove the trial court's discretion with respect to parent-child contact. See LeBlanc, 2014 VT 65, ¶¶ 16, 26 (applying deference to trial court's judgment regarding visitation schedule in "close case" and finding schedule did not contravene Legislature's directive under 15 V.S.A. § 650). Here, the trial court established a parent-contact schedule based on a reasonable weighing of the evidence that provides both parents time with their child. Id. ¶ 26 (explaining that appellant's burden is to demonstrate trial court's decision was "unreasonable," amounting to abuse of discretion). While we note that there may be a case in which the parent-child contact schedule is so imbalanced that § 650 comes into play, we reject father's assertion that the parent-contact plan

¶ 12.    Title 15, section 665 of the Vermont statutes establishes the criteria for allocating parental rights and responsibilities, including child custody and parent-child contact.  Section 665 provides that when parents cannot reach an agreement on how to divide parental rights and responsibilities, the family court should award such rights and responsibilities "primarily or solely to one parent."  Id. § 665(a).  In making its determination, the court "shall be guided by the best interests of the child" and shall consider various factors enumerated in the statute.  Id. § 665(b).

¶ 13.    On appeal, father asserts that the trial court abused its discretion in setting the parent-child contact schedule because the plan: (1) does not provide adequate time for him to visit and develop his relationship with his daughter;[4] (2) applies an unfair "belt-and-suspenders" approach that restricts his time with her and also imposes additional alcohol-related conditions on their limited time; and (3) fails to provide a mechanism for future modification of the parent-child contact order.

¶ 14.    Here, the trial court analyzed the parent-child relationship and environmental factors set forth in 15 V.S.A. § 665(b) to shape the parent-child contact schedule.  The court found that, when father was sober, both parents were similarly positioned to care for their daughter and to provide for her present and future needs.  However, the court expressed serious concerns over

_____

here violates the Legislature's directive that children should "have the opportunity for maximum continuing physical and emotional contact with both parents."  15 V.S.A. § 650.

[4] Father references numerous academic journals and materials throughout his brief, which is styled as a Brandeis brief.  Mother contends these materials are impermissible because they require us to take judicial notice of materials outside of the trial court's record.  We find the use of Brandeis materials valuable in appropriate cases to illuminate the social context for a decision, particularly where a decision will have widespread social, economic, or legal considerations.  See E. Margolis, Beyond Brandeis, 34 U.S.F. L. Rev. 197 (2000) (explaining efficacy of Brandeis briefs and types of cases in which non-legal materials are most useful to appellate courts addressing policy arguments: common law cases of first impression, constitutional cases raising novel applications of constitutional provisions, and cases requiring statutory interpretation). As such, we have considered the Brandeis materials insofar as they serve to illuminate the legislative policy behind § 650.

father's relapses and continued alcohol abuse. The court highlighted evidence that father's alcoholism posed a significant risk to his daughter's well-being while she was in his care. After balancing the § 665(b) factors and reviewing the contact schedules proposed by the parties, the court determined that because it lacked confidence that father could maintain his sobriety given his history, father's visitation would be limited to every other weekend with no overnight visits for the first ninety days.

¶ 15. As explained above, the court's parent-child contact decisions must serve the best interests of the child, after consideration of the factors set forth in § 665(b). DeLeonardis, 2010 VT 52, ¶ 24. We give broad discretion to the trial court's weighing of the evidence; "[t]hat a different weight or conclusion could be drawn from the same evidence may be grist for disagreement but does not show an abuse of discretion." Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059 (mem.). The trial court met its burden under § 665 and our caselaw when it made findings regarding each of the statutory factors and provided clear and articulable reasons for structuring the parent-child contact schedule as it did. The trial court explained that it fashioned the parent-child contact order in the manner it did based on father's history of alcoholic relapses, secret drinking, and putting the child at risk while intoxicated. The trial court was not convinced that father could remain sober and not relapse despite his efforts; it anticipated father would likely relapse and that such a relapse would likely place his daughter at risk.

¶ 16. In its amended final order, the court stated that it was in the daughter's best interests to "have a stable and safe home environment." The court expressed its view that at "seven year[s] old [the daughter] cannot and should not be expected to serve as an alcohol monitor during periods of parent child contact." In balancing "the desire for frequent and consistent parent child contact [between father and daughter] with the risks posed to the child when Father is unable to maintain his sobriety," the court warned that "[t]he risks are not limited to the significant immediate dangers presented by the lack of appropriate supervision when an alcoholic parent is intoxicated" but

7

extended to the "disruptions that would occur in the daily routines of the minor child" as the consequence of father's relapses.

¶ 17. In light of this view, the court's "belt-and-suspenders" approach limiting and conditioning father's parent-child contact was reasonably structured to secure the best interests of the child by attempting to ensure father was sober when caring for her. Notably, father acceded to—and even proposed—these conditions on his time with his daughter; the fact that the court adopted them when setting the parent-child contact schedule is not surprising.

¶ 18. We also disagree with father's assertion that there is no way to modify the parent-child contact award. First, there is a clause built into the order to allow modification of the contact order by agreement of the parties at any time without court order. Additionally, the court's order limiting contact to the extent of the existing order is clearly based on the court's continuing concern with father's potential to relapse, including relapses after the parties' separation. Because the parent-child contact schedule was fashioned with a baseline to account for father's continued struggle with alcoholism, father may be able to show an unanticipated change in circumstances sufficient to give rise to a motion to modify if he can demonstrate successful control over his alcoholism. See 15 V.S.A. § 668(a) (court may modify order granting parental rights and responsibilities "upon a showing of real, substantial and unanticipated change of circumstances"). When a modification of parent-child contact is sought, the burden to establish a real, substantial, and unanticipated change of circumstances is not as high as in the case of an attempt to modify parental rights. Weaver v. Weaver, 2018 VT 38, ¶ 18, __ Vt. __, __ A.3d __.

¶ 19. Because the trial court engaged in weighing the § 665(b) factors to promote the best interests of the child and provided a reasoned analysis of its decision awarding parent-child contact, we find no abuse of discretion and affirm the order.

8

IV. Legal Parental Rights and Responsibilities

¶ 20.    Next, we consider whether the court abused its discretion in allocating both legal and physical parental rights and responsibilities to mother.  Though the parties agreed that mother would have primary physical rights and responsibilities for their daughter, father asserts that the court erred in awarding all legal rights and responsibilities to mother because it failed to articulate the merits of its decision.  Father contends that, apart from his alcohol use, the parties are equally qualified to be responsible for their daughter and that he has an interest in legal decision-making, particularly regarding medical and dental decisions.  We agree that the court's decision fails to adequately explain the rationale behind the division of parental rights and responsibilities, and we reverse and remand for the court to make further findings and conclusions on this issue.

¶ 21.    Under 15 V.S.A. § 665, the court must be guided by the statutory factors and the best interests of the child when awarding parental rights and responsibilities.  As with establishing parent-child contact, the trial court is granted broad discretion in allocating parental rights and responsibilities.  Kasper v. Kasper, 2007 VT 2, ¶ 5, 181 Vt. 562, 917 A.2d 463 (mem.).  However, the court must state its reasoning for awarding parental rights and responsibilities in its order, and its reasoning may not be based on an "erroneous view of the law or on a clearly erroneous assessment of all the evidence."  Bratton, 2018 VT 54, ¶ 17 (citing Cooter & Gell v. Hartmark Corp., 496 U.S. 384, 405 (1990)); see also Kasper, 2007 VT 2, ¶ 5 ("Where the [court's] award of [parental rights and responsibilities] reflects its reasoned judgment in light of the record evidence, its decision may not be disturbed.").  Thus, we will overturn the court's parental-rights-and-responsibilities determination when the court fails to explain how it weighed the § 665(b) factors and reached the conclusion that the order satisfied the best-interests-of-the-child standard.

¶ 22.    For example, in Pigeon v. Pigeon we held that the court abused its discretion in transferring sole legal custody to mother because it "made no reference to its consideration of the best interests factors or that its decision is in the child's best interests."  173 Vt. 464, 465, 782

9

A.2d 1236, 1237 (2001) (mem.). Similarly, in <u>Nickerson v. Nickerson</u>, we overruled the trial court's decision when the court failed to adequately explain how it applied the primary-care-provider criteria under § 665(b)(6) in its custody determination. 158 Vt. 85, 89, 605 A.2d 1331, 1333 (1992). In our holding, we stated that "[w]hen the relevant legal criteria . . . set out in 15 V.S.A. § 665(b)[] are applied to the facts, it is important for the appellate court to know <u>how</u> the trial court weighed the facts and blended the standards to arrive at the conclusion." <u>Id</u>. at 89, 605 A.2d at 1333. We cannot provide a "meaningful review" of the trial court's order when we are "left to speculate as to the reasons the court favored" one party over the other when comparing their respective attributes. <u>Id</u>. at 91, 605 A.2d at 1334. Such is the case here.

¶ 23. Here the court explained its legal-rights-and-responsibilities determination in brief:

> The parties[] have historically demonstrated an ability to communicate and make joint decisions regarding [their daughter] but [father's] most recent relapse has caused [mother] to lack confidence in [father] as a reliable partner in legal decision-making. [Father] has proposed that legal decision-making for [their daughter] be divided. He has proposed that he provide health insurance for [their daughter] and be entrusted with decisions related to her medical and dental care. <u>It is not, however, prudent for the parent with physical responsibility to be divested of legal responsibility for medical and dental decisions</u>.

(Emphasis added.) The court does not address father's argument that he should carry the medical insurance and make the medical and dental decisions for their daughter beyond stating that he is not the custodial parent. Mother asks us to impute the court's concerns regarding father's alcoholism from its analysis of the parent-child contact schedule to its analysis of parental rights and responsibilities. Mother asserts that the court's findings regarding father's alcohol abuse support the court's award of legal rights and responsibilities solely to mother. However, we cannot speculate or insert our own analysis into the trial court's decision-making process. While the court made findings regarding the § 665(b) factors, we conclude that the court's analysis when determining legal parental rights and responsibilities in its order is simply too conclusory to

10

provide a full explanation as to how the § 665(b) factors were applied to the facts in this case. This is particularly the case with other aspects of legal responsibility beyond medical and dental decisions, where the court awarded them to mother without discussion beyond merely stating that mother had lost confidence in father's decision making abilities due to his alcoholic relapses. If the court's legal rights and responsibilities determination was similarly based on father's unreliability, it was not made clear in the conclusions.

¶ 24.    In the context of the court's decision, we cannot tell whether its admonition that it is not prudent to divest the parent with sole physical responsibility of legal responsibilities reflects a considered determination that in this case it is best to assign legal rights and responsibilities to the physical custodian or a misunderstanding of the applicable law. The trial court has the discretion to make a "split custody" award, in which the court allocates some or all decision-making authority to the noncustodial parent. For example, in Chase v. Bowen, we upheld the trial court's award of sole physical custody to the mother and sole legal responsibility to the father. 2008 VT 12, 183 Vt. 187, 945 A.2d 901. We noted that, "[a]lthough routine splitting of physical and legal rights and responsibilities can be unwise, in some situations it is appropriate to grant one parent legal rights and the other physical rights." Id. ¶ 41. We have explained that "exceptional circumstances" are not required for the court to apportion legal rights and responsibilities between parties, Solsaa v. Solsaa, 2008 VT 138, ¶ 8, 185 Vt. 587, 969 A.2d 116 (mem.), and that while "one parent must be given primary responsibility to make decisions on behalf of the child," that "does not lead inexorably to the conclusion that one parent must be awarded all rights and responsibilities." Shea v. Metcalf, 167 Vt. 494, 500, 712 A.2d 887, 890-91 (1998) (quotation omitted) (upholding award of primary physical responsibilities to mother and legal responsibility for medical and educational decisions to father). On the other hand, a court can reasonably conclude that a child's best interests will be served by assigning legal rights and responsibilities to the parent entrusted with physical rights and responsibilities based upon that parent's status as the

11

custodial parent. Given the conclusory and generalized nature of the court's remark, we cannot tell whether the court here was exercising its discretion to keep legal and physical rights and responsibilities aligned because it concluded that doing so was in the child's best interest in this case, or whether it incorrectly believed it was compelled to assign legal rights and responsibilities to mother because she was the physical custodian.

¶ 25. Despite the discretion afforded the trial court in this area, the court's application of the law to the findings must be adequate to explain how the court arrived at its decision. Remand is necessary where this Court cannot fully discern the basis for the trial court's decision from the findings. Parker v. Parker, 2012 VT 20, ¶ 15, 191 Vt. 222, 45 A.3d 48. Such is the case here, and therefore we reverse and remand this issue to the trial court for further clarification.

V. Property Division

¶ 26. Finally, we address father's contention that the court erred in dividing the parties' marital property. Even with the broad discretion afforded to trial courts in apportioning marital property, we conclude the court erred in its property-division determination. First, the court abused its discretion by valuing the parties' marital assets as of the date of the parties' separation rather than the date of the final divorce hearing. Second, we are unclear whether the court considered the economic partnership inherent in the parties' long-term marriage when apportioning their assets.

A. Valuation of Marital Assets at Time of Hearing

¶ 27. Section 751 of Vermont's Title 15 charges the court with "settl[ing] the rights of the parties to their property . . . and equitably divid[ing] and assign[ing] the property." Under Vermont law, "[a]ll property owned by either or both of the parties, however and whenever acquired, shall be subject to the jurisdiction of the court." 15 V.S.A. § 751(a). "Assets are valued for distribution purposes as of the date of the final hearing, regardless of whether acquired before or after the marriage," Hayden v. Hayden, 2003 VT 97, ¶ 8, 176 Vt. 52, 838 A.2d 59, and "[a]s a

12

general proposition, marital assets should be valued as close to the date of trial as possible." Albarelli v. Albarelli, 152 Vt. 46, 48, 564 A.2d 598, 599 (1989). "It is an abuse of discretion for the trial court to premise its division of marital property on outdated valuations of the assets involved." Cleverly v. Cleverly, 151 Vt. 351, 354-55, 561 A.2d 99, 101 (1989).

¶ 28. On appeal, we agree with father that the court should have valued the parties' marital property as close to the date of the final divorce hearing as possible, not the date of the parties' separation. Id. (stating equitable distribution of marital property cannot be made using stale valuation data). Here, valuing the parties' retirement funds[5] and other marital property as of the time the parties separated in December 2015, rather than when the court held the final hearing in September 2017, may mean the court did not accurately consider the entire monetary value of the parties' marital assets. Absent additional findings by the court indicating that the value of the parties' assets had not appreciably changed since separation, the date of the final hearing should have been used to value the retirement funds, equity in the marital home, and other marital property.[6]

---

[5] Regarding the appropriate valuation of the retirement funds, in Hayden we held that the trial court erred by not considering the entire monetary value of the parties' retirement plan at the time of the final hearing. 2003 VT 97, ¶ 8. Mother points to Russell v. Russell for the proposition that the court has discretion to value marital property at the time of separation. 157 Vt. 295, 305, 597 A.2d 798, 804 (1991). In Russell, the trial court used the date of the parties' separation to apportion a pension that was only partly attributable to the marriage because the date of separation was the "most reflective of the functional end of marriage." Id. The retirement funds here are essentially savings accounts and thus there is no need to calculate a coverture fraction, as is the case with a pension earned partly within and partly outside of the marriage. Like other marital assets, the retirement should be valued as close as possible to the date of the final hearing to reflect the true value of the asset. The court can then make equitable adjustments in how the funds are divided, as it may also do with other assets and debts which have changed in value since separation due to deposits, payments made, or expenses incurred by one or both parties. Hayden, 2003 VT 97, ¶¶ 8-13; Albarelli, 152 Vt. at 48, 564 A.2d at 599.

[6] As noted above, father asserts that the court's evaluation and division of the marital property resulted in a 70.8/29.2 split, rather than a 60/40 split in favor of mother due to the valuation of the retirement funds and outstanding mortgage balance as of the date of the parties' separation and the assignment of father's debt. The trial court explained its decision regarding the assignment of the mortgage balance and father's debt in its January entry order. Because we

B.  Equitable Division of Marital Property in a Long-Term Marriage

¶ 29.   The court is charged with ensuring that marital assets are distributed between the parties in an equitable manner.  15 V.S.A. § 751.  However, an equitable division does not necessarily mean an equal one.  Myott v. Myott, 149 Vt. 573, 579, 547 A.2d 1336, 1340 (1988).  Section 751(b) outlines the factors that a court may consider when dividing marital property, including the length of the marriage, the occupation and income of the parties, the relative needs of the parties, the disparity in the parties' financial circumstances, the parties' vocational skills and employability, their respective opportunities for future earnings, and the relationship between the property and maintenance award.  15 V.S.A. § 751(b).  The family court has broad discretion when analyzing and weighing the statutory factors considering the record evidence.  Wade v. Wade, 2005 VT 72, ¶ 13, 178 Vt. 189, 878 A.2d 303.  "There is no specific formula for assessing these factors," and "all that is required is that the distribution be equitable."  Casavant v. Allen, 2016 VT 89, ¶ 15, 202 Vt. 606, 151 A.3d 1233 (quotation omitted).  "The court need not specify the weight given to each factor, but is required only to provide a clear statement as to what was decided and why."  Molleur v. Molleur, 2012 VT 16, ¶ 15, 191 Vt. 202, 44 A.3d 763 (quotation omitted).

¶ 30.   When analyzing the § 751(b) factors in the context of a long-term marriage, our caselaw instructs courts to balance the parties' relative contributions to the marriage with "the asymmetry in the parties' circumstances and future prospects" to craft an equitable property award.  Id. ¶ 19.  In reviewing property-division decisions in long-term marriages, we have recognized that long-term marriages are essentially an economic partnership.  As such, although there is no "hard-and-fast rule of equal division," Goodrich v. Goodrich, 158 Vt. 587, 593, 613 A.2d 203, 206 (1992), when apportioning marital assets in a long-term-marriage courts often assume an equal

remand to the trial court for further proceedings concerning the division of the parties' marital assets using current values, we need not determine the actual percentage of distribution or whether a distribution on the percentage asserted by father would be an abuse of discretion.

14

division (50/50) as a starting point for calculating the property award. See <u>Golden v. Cooper-Ellis</u>, 2007 VT 15, ¶ 35, 181 Vt. 359, 924 A.2d 19 (awarding "a nearly exact fifty-fifty division of the marital assets" to husband and wife in divorce proceeding following long-term marriage); <u>Guiel v. Guiel</u>, 165 Vt. 584, 584, 682 A.2d 957, 958 (1996) (mem.) (upholding court order that "the parties' assets be divided roughly equally, and that husband pay wife permanent maintenance in an amount sufficient to equalize the parties' incomes").

¶ 31.    Courts are, of course, free to divide property on some basis other than an equal division in a long-term marriage. In such cases, as in all others, the court must articulate the reasons behind its decision. <u>Molleur</u>, 2012 VT 16, ¶ 15. For example, we have noted that disparity in the parties' ability to contribute financially is often due to decisions made jointly by the parties throughout the long-term marriage. As such, the division need not necessarily track the parties' earnings to be equitable; we have upheld property awards that favor the party with less earning capacity upon exiting the marriage. See <u>id</u>. ¶ 9 (upholding award of 75% of marital portion of husband's pension to wife even though "respective contributions of the parties fell on husband's 'side of the ledger' " because he "had been the primary source of the family's income"); see also <u>Felis v. Felis</u>, 2013 VT 32, ¶ 28, 193 Vt. 555, 72 A.3d 874 (affirming award of 57% of parties' marital property to wife, who remained home and contributed less monetary assets in long-term marriage than husband); <u>Bell v. Bell</u>, 162 Vt. 192, 198, 643 A.2d 846, 850 (1994) (upholding court's 60/40 split of marital property in favor of wife, who had less earning capacity in long-term marriage); <u>Daitchman v. Daitchman</u>, 145 Vt. 145, 151-52, 483 A.2d 270, 273-74 (1984) (upholding unequal property division in long term marriage and recognizing that respective merits of parties factor is designed to call court's attention to fact that award should take into account equities as measured in connection with parties' conduct during coverture).

¶ 32.    The parties in this case have shared a long-term marriage and made joint decisions regarding the families' location, care for their daughter, travel, and finances. In its decision, the

trial court found that, although mother was the primary financial provider throughout the marriage, both parties were well-educated, able to continue earning an income, and contributed to the marriage. The court found that mother had an estimated annual income of $138,960 for 2017, while father's anticipated income for the same year was $83,196. The court noted several times that mother was the "primary earner," and father recognized that mother had "always been the bus driver." To the extent the court addressed father's contributions, the court indicated that father contributed to family expenses inconsistently, that mother had to pay off his credit card bills, that "despite [father's] ability to earn a sizeable wage," mother was "the primary earner", and that "[mother] handled all of the details of [their daughter's] care." Father emphasizes that he previously stayed home to care for their daughter while she was a toddler, however, the court noted that mother had lost faith in father's decision-making abilities. The court did not make a finding of fault pursuant to 15 V.S.A. § 751(12). The court did not make an award of spousal maintenance to father. Further, the court did not make a finding that mother had brought significantly disproportionate resources into the marital estate through sources other than her own earnings. Based on these findings and conclusions, the trial court awarded 60% of the marital estate to mother and 40% to father but did not explain how it applied the statutory factors to the findings to come to that decision as required by our caselaw. Molleur, 2012 VT 16, ¶ 15.

¶ 33. In the context of a long-term marriage such as the one here, the court's order lacks sufficient analysis balancing the merits of the parties' contributions over the course of the marriage and their joint decision-making with the rest of the § 751 factors. Most importantly, the court failed to clearly articulate why it awarded the spouse with the greater financial contributions and historically higher earning capacity a larger percentage of the parties' property in the context of their long-term marriage. As noted above, while the court was not required to divide the property equally, the court was required to explain the basis for weighting the property division in favor of the spouse with the greater monetary contributions and earning potential. Here, the court made

numerous findings and conclusions regarding mother's financial and non-monetary contributions, such as serving as the primary earner, paying off father's debts and the mortgage, and handling their daughter's care; but the court failed to explain how it evaluated father's contributions, such as always maintaining a flexible employment schedule and purportedly caring for their daughter as a toddler, alongside the § 751 factors. Even though mother contributed more financially to the couple's lifestyle, mortgage payments, and retirement funds, the court must explain why the 60/40 split of the marital estate was equitable, beyond merely acknowledging mother's greater monetary contribution, in light of the parties' long-term economic partnership and the other statutory factors.

The trial court's award of parent-child contact is affirmed; the court's award of parental rights and responsibilities and division of marital property are reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

17